# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| EXPRESS SCRIPTS, INC. and CIGNA CORPORATION, | Civil Action No. _____ |
| Plaintiffs, | |
| v. | **VERIFIED COMPLAINT** |
| Arefin Kabir, | |
| Defendant. | |

Plaintiffs Express Scripts, Inc. ("Express Scripts") and Cigna Corporation ("Cigna") (collectively "Plaintiffs"), by and through their undersigned counsel, bring this action for injunctive relief, monetary damages, the attorneys' fees and expenses that it incurs in this action, and other necessary and proper relief as the Court may deem just and proper.

## PRELIMINARY STATEMENT

1.     This is an action for equitable and legal relief against a former Express Scripts employee who, in the days and weeks preceding his departure from the company, misappropriated Express Scripts's trade secrets and transmitted valuable confidential and proprietary Express Scripts's information via email from his work email address to his personal Yahoo! email address.

2.     As Director of Pharma Strategy & Contracting at Express Scripts,[1] Defendant Arefin Kabir ("Kabir") was privy to some of the most sensitive trade secrets and confidential information used in Express Scripts's business, including highly-sensitive rate information, trade

---

[1] Express Scripts is a subsidiary of Cigna that operates as a pharmacy benefit management (PBM) organization that provides integrated pharmacy benefit management services, including network-pharmacy claims processing, pharmacy services, specialty pharmacy benefit management, benefit design consultation, drug-utilization review, formulary management, and medical an drug analysis services to manage drug plans for health plans, self-insured employers and government agencies (both as administrator of employee benefits and public assistance programs). Express Scripts also offers PBM services for workers' compensation insurance programs.

secret data concerning rebates negotiated by Express Scripts with drug manufactures, confidential customer data, etc..

3.     Upon learning that Express Scripts would be terminating his employment, Kabir embarked on a brazen campaign to misappropriate Express Scripts trade secrets.  Between October 16, 2020 and December 16, 2020, Kabir sent highly confidential formulary, pricing, rebate and other data and information to his personal email account.

4.     Kabir remains in possession of that data and information, which are trade secrets and proprietary information of Express Scripts and from which Plaintiffs derive millions of dollars of revenue.

5.     Kabir's sending of highly sensitive and restricted information to his personal email address is a clear violation of Cigna's Information Protection Standards, the Confidentiality, Non-Competition and Non-Solicitation Agreements that Kabir signed, and Kabir's legal obligations to Cigna.  A true and correct copy of the February 2020 Non-Confidentiality, Non-Competition and Non-Solicitation Agreement that Kabir signed (the "2020 Agreement") is attached hereto as Exhibit A.  A true and correct copy of the October 2016 Non-Confidentiality, Non-Competition and Non-Solicitation Agreement that Kabir signed (the "2016 Agreement") is attached hereto as Exhibit B.

6.     Kabir's actions also constitute a violation of the Federal Defend Trade Secrets Act insofar as Kabir has misappropriated Express Scripts's confidential and proprietary information that qualifies as trade secrets without the express or implied consent of Express Scripts.

7.     Plaintiffs bring this action seeking a temporary restraining order, preliminary injunction and permanent injunction: (i) compelling Kabir to turn over to Express Scripts all confidential and proprietary information in his possession, including all copies of the files that

Kabir sent to his personal email address between October 16, 2020 and December 17, 2020; (ii) requiring Kabir to submit his laptop(s), smart phones, tablets, hard drives, flash drives and any other electronic devices in his possession for a forensic examination by a third party vendor so that all of Plaintiffs' confidential and proprietary property and data residing on those devices can be extracted and deleted from the devices; and (iii) requiring Kabir to provide a detailed accounting, under oath, of what he did with the highly sensitive documents and information that he took from Plaintiffs.

8.      Plaintiffs also seek monetary damages stemming from Kabir's willful and malicious actions and attorneys' fees pursuant to the express language of the Agreements.

## THE PARTIES

9.      Plaintiff Express Scripts, Inc. is a Delaware corporation with its headquarters and principal place of business at One Express Way, Saint Louis, Missouri, 63121.  Express Scripts is an indirect subsidiary of Cigna Corporation.

10.     Plaintiff Cigna Corporation is a Delaware corporation with its headquarters and principal place of business at 900 Cottage Grove Road, Bloomfield, Connecticut, 06002.

11.     Defendant Kabir is the former Director of Pharma Strategy & Contracting at Express Scripts.  His last known address is 902 Lagoon Drive, Oviedo, Florida 32765.

## JURISDICTION AND VENUE

12.     This Court has personal jurisdiction over Kabir insofar as he lives and worked in this district and expressly consented to jurisdiction in this Court in the 2020 Agreement.  *See* Ex. A, §2.1(b).

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because Kabir is the only Defendant in this action and he resides in Florida.  Moreover, the parties expressly agreed that any action or proceeding between them arising from the 2020 Agreement would be

brought exclusively in the state or federal courts of the state of Florida, which is the state where Kabir last worked for Express Scripts. Ex. A, §2.1(b).

14.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Express Scripts's claim under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq.*, arises under federal law, and this Court has supplemental subject-matter jurisdiction over Express Scripts 's remaining state law claims pursuant to 28 U.S.C. § 1367 because they are so related to Express Scripts's federal DTSA claim that they form part of the same case or controversy and derive from a common nucleus of operative fact.

15.     This Court also has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy in the present action exceeds the sum or value of seventy five thousand dollars ($75,000.00), exclusive of interests and costs, and complete diversity of citizenship exists between the parties, as Express Scripts is a citizen of Delaware and Missouri and Kabir is a Florida citizen.

## FACTUAL ALLEGATIONS

**A.    Kabir Contracted Not To Take or Disclose Plaintiffs' Trade Secrets And Confidential Information.**

16.     As the Director of Pharma Strategy & Contracting, Kabir occupied a position of trust and confidence, with access to some of the most sensitive and confidential aspects of Express Scripts's business.

17.     In his role at Express Scripts, Kabir was involved in managing a portfolio of dozens of pharmaceutical contracts that generated sizeable revenue for Express Scripts.

18.     On behalf of Express Scripts, Kabir was involved in negotiating the terms and conditions of pharmaceutical contracts for Commercial, Exchange, Medicare and Medicaid books of business, advising pharmaceutical manufacturers and consultants on market access and

DocuSign Envelope ID: 826E61DC-7C23-47BF-A779-E72A1A00AAC0

pricing. He provided advice to large national payers, rebate accumulators and PBM clients on therapeutic strategy development and net cost management.

19.     Kabir and Express Scripts entered into multiple Confidentiality, Non-Competition, and Non-Solicitation Agreements prior to and during his Express Scripts employment.     The most recent Confidentiality, Non-Competition, and Non-Solicitation Agreements signed by Kabir in February 2020.[2]

20.     Pursuant to the 2020 Agreement, Kabir agreed that he would not, during or after the termination of his employment, use or disclose any of Plaintiffs' trade secret information except as required by his responsibilities to Express Scripts:

(a) Employee agrees that all records and Confidential Information obtained by Employee as a result of Employee's employment with the Company, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein or derived therefrom, are confidential and the sole and exclusive property of the Company. Employee understands and agrees that the business of the Company and the nature of Employee's employment will require Employee to have access to Confidential Information of and about the Company, its business, its prospects, and its Customers. During Employee's employment and thereafter, Employee will not use Confidential Information or remove any such records or information from the premises or computer systems of the Company except for the sole purpose of conducting business on behalf of the Company. Employee further agrees that during Employee's employment and thereafter, Employee will not, without express consent of the Company, divulge or disclose this Confidential Information to any third party other than for the purposes of performing Employee's job duties with the Company, and under no circumstances will Employee reveal or permit this information to become known by any competitor of the Company.

(b) Employee agrees not to use or attempt to use any Confidential Information on behalf of any person or entity other than the Company, or in any manner which may injure or cause loss or may be calculated to injure or cause loss, whether directly or indirectly, to the Company. If at any time over the last two years of Employee's employment with the Company, Employee's position included access to Confidential Information as described above, specifically related to the Company's procurement of prescription drugs, Employee understands and agrees that Employee's subsequent employment with a pharmaceutical manufacturer, distributor or supplier ("Pharmaceutical Entity") would create a substantial risk of use and/or disclosure of Confidential Information with which Employee has been or will be entrusted during Employee's employment with the Company. Specifically, Employee agrees that the disclosure of such Confidential Information to the Company's pharmacy benefits management competitors with

---

[2]   Kabir signed the 2016 Agreement as a condition of his commencing employment with Express Scripts and he signed the 2020 Agreement in conjunction with his receipt of an equity grant from the company.

which one may negotiate in the course of employment with such Pharmaceutical Entity, would cause immediate and irreparable harm to the Company. In light of this risk of disclosure under such circumstances, and in recognition of the severity of harm that would result from such disclosure, Employee acknowledges and agrees that the Company will be entitled to immediate injunctive relief to prevent Employee from disclosing any such Confidential Information in the course of Employee's employment with any such Pharmaceutical Entity.

(c) During Employee's employment, Employee shall not make, use, or permit to be used, any materials of any nature relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs other than for the benefit of the Company. Employee shall not, after the termination of Employee's employment, use or permit to be used any such materials and shall return same in accordance with Section 1.2 below.

Ex. A, §1.1 ("Confidentiality, Non-Disclosure and Non-Use Obligations").

21.     The 2020 Agreement defines "Confidential Information" as follows:

*"Confidential Information"* means all confidential and/or proprietary information and trade secrets that are not generally known to the public, in any form, whether oral, written, computerized or otherwise, regarding the Company, including but not limited to: computer code generated or developed by the Company; software or programs and related documentation; strategic compilations and analysis; strategic processes; business or financial methods, practices and plans; non-public costs and prices; operating margins; marketing, merchandising and selling techniques and information; customer lists and information; prospective customer lists and information; provider lists and information; vendor, supplier, and business partner lists and information; details of customer agreements; pricing arrangements with pharmaceutical manufacturers, distributors or suppliers including but not limited to any discounts and/or rebates; pricing arrangements with insurance clients and customers; pharmacy reimbursement rates; premium information; payment rates; contractual forms; expansion strategies; real estate strategies; operating strategies; sources of supply; patient records; business plans; other financial, commercial, business or technical information related to the Company and confidential information of third parties which is given to the Company pursuant to an obligation or agreement to keep such information confidential.

22.     Via the 2020 Agreement, Kabir also committed that he would, upon the

termination of his employment, immediately deliver to Company all property of the company:

Employee agrees that upon termination of Employee's employment with the Company or at the request of the Company at any time, Employee will immediately deliver to the Company all property of the Company, including without limitation all equipment owned or leased by the Company, and all documents, information, records, materials, and copies thereof in any form, that are related in any way to the Company or its business, or which are otherwise referred to in Section 1.1 above and as defined in Section 1.9 below. Employee understands that this includes, but is not limited to, delivery to the Company of all documents, memoranda, notes, records, data, computer programs, disks, data contained on hard drives or other computer or electronic storage media, or reports (and all copies thereof) made or compiled by, delivered to, or otherwise acquired by Employee concerning, containing or embodying any Confidential Information.

Ex. A, §1.1 ("Return of Information, Records and Materials").

23.    The Confidentiality, Non-Competition, and Non-Solicitation Agreements signed by Kabir confirm that Express Scripts conditioned Kabir's employment and compensation on his agreement to abide by their terms, including the confidentiality provisions.  *See e.g.* Ex. A, Introductory Paragraph; Ex. B, Introductory Paragraph.  Express Scripts would not have allowed Kabir to become or remain employed with the Company without his execution of the Confidentiality Agreements.

24.    As an Express Scripts employee, Kabir was subject to Cigna's Information Protection Standards, including those with regard to acceptable use of Cigna's electronic systems and teleworking security requirements.  Those standards prohibited Kabir from moving or copying from any Cigna network resource any highly sensitive and restricted information.  Under those standards, employees may not electronically communicate any Cigna owned information outside of the organization unless approved by Cigna management in advance.

25.    Express Scripts prohibits employees from communicating sensitive information (e.g., confidential, regulated data, non-public personal information, etc.) to the Internet, via email, text or instant messaging services.

26.    Each time Kabir attempted to send Express Scripts's materials to his personal email address, he received an Alert email notifying him that the email was being held by the Express Scripts information technology systems and that he needed to confirm that the email did not violate company policy prohibiting the forwarding of data to personal email addresses if he wanted the email released.

27.    The 2020 Agreement specifies that in any action alleging a breach thereof, the Company shall have the right to conduct a forensic examination of any computers and/or

electronic devices in Employee's possession or control if the Company reasonably believes such devices contain Confidential Information or other Company property. It further states that in connection with any application for injunctive relief to enforce the 2020 Agreement, such forensic review and other necessary discovery shall be conducted on an expedited basis. *See* Ex. A, §1.6(d).

28.     On February 27, 2019, Kabir was granted shares of restricted stock pursuant to the Cigna Long-Term Incentive Plan and a Restricted Stock Grant Agreement. A true and correct copy of the Restricted Stock Grant Agreement is attached hereto as Exhibit D.

29.     The Restricted Stock Grant Agreement provided:

Promise Not To Disclose Cigna Companies' Confidential Information:

(A) You Promise not to disclose any Confidential Information to any third party at any time, whether during or after your employment, without the prior written consent of Cigna (except to the extent required by an order of a court having competent jurisdiction or a properly issued subpoena) unless that Confidential Information was previously disclosed publicly by Cigna or has become public knowledge (other than by your disclosure).

Ex. D, §7(c)(5).

30.     The Restricted Stock Grant Agreement defined Confidential Information as follows:

"Confidential Information" means any Cigna company trade secrets, confidential information, or proprietary materials, including but not limited to customer lists, financial records, marketing plans and sales plans.

Ex. D, §7(c)(5)(C).

31.     Pursuant to the Restricted Stock Grant Agreement, if Kabir engages in willful misconduct or discloses Confidential Information, Kabir forfeits all unvested shares that were

granted to him and must pay to Cigna the value he realized from shares that vested during the 12-month period ending on the date of the violation. *See* Ex. D, §8.

32.     Kabir realized $5,016 from shares that vested during the period between October 16, 2019 and October 16, 2020 and he is obligated to immediately pay that amount to Cigna.

33.     Pursuant to the Restricted Stock Grant Agreement, Cigna is entitled to seek and obtain an injunction without being required to post a bond. *See* Ex. D, §9.

**B.     Kabir Offloaded Plaintiffs' Trade Secrets And Confidential Information By Sending The Information To His Personal Email Account Between October 16, 2020 and December 16, 2020.**

34.     On October 16, 2020, Express Scripts notified Kabir that his last day of work would be October 16, 2020 and that his employment with Express Scripts would terminate effective December 16, 2020.

35.     Express Scripts informed Kabir that he was not expected to perform any work for Express Scripts during that 60-day period but he could seek other jobs within the Cigna family of companies during that time.

36.     Between October 16, 2020 and December 16, 2020, Kabir had no legitimate business need to access, send or distribute Cigna trade secrets or Cigna's confidential or proprietary information.

37.     Beginning just hours after Express Scripts notified Kabir of his termination on October 16, 2020 and continuing until the last day of his notice period (December 16, 2020), Kabir accessed, and sent to his personal Yahoo! email address, extremely valuable, incredibly sensitive and highly confidential Express Scripts data and information.

38.     The activity in Kabir's Express Scripts email account confirms this calculated and unauthorized offloading of trade secrets and other highly confidential information. Among the

highly-confidential documents that Kabir sent from his Express Scripts email (AKabir@express-scripts.com) to his personal Yahoo! email (arefinkkabir@yahoo.com) were the following:

| Date Sent | Subject | File Names |
|---|---|---|
| 10/16/20 12:43pm | Email AK | ICCV 2021 Grid.pptx |
| 10/18/20 10:56pm | learning material | Commercial.xls<br>Medicare.xls |
| 12/14/20 11:14am | mail from ak2 | Master standard formulary status and pref alt 10 02 2020 |
| 12/14/20 11:04am | mail from ak | 2020_10_21 Pebble CPC Market Share |
| 12/16/20 12:36pm | mail from ak 3 | 3Q20 NPF & BoB CPD Mail-Retail |

39.     When Kabir sent each of the emails above to his personal email address, he received an Alert email warning him that company policy prohibits the sending of Express Scripts's data to personal email addresses.  After receiving each of those alert emails, Kabir authorized the release of the emails in violation of company policy.  The Alert and release authorization emails are attached hereto as Exhibit C.

40.     The files that Kabir sent to his Yahoo! account contain critically sensitive, confidential information.  For example, the files contain rebate data at a drug level for numerous pharmaceutical manufacturers.  In the PBM context, manufacturers pay rebates to lower the net cost of products for clients and patients.  The net cost of competing products is used to determine formulary placement.  This rebate information is highly confidential and governed by written Non-Disclosure Agreements between the pharmaceutical manufacturers and Express Scripts.

41.     Express Scripts uses that confidential rebate information to make formulary decisions, to develop bids and compete for new business, to determine pricing and to drive down costs for clients, patients and the healthcare system by competing manufacturers of products against one another.

42.     In his role at Express Scripts, Kabir's was responsible for negotiating rebates with pharmaceutical manufacturers from a plan sponsor perspective.  He is well aware that the rebate

data that he accessed during his notice period and sent to his Yahoo! email address is highly sensitive information is at the core of Express Scripts business.

43.     There is no way that Express Script clients or competitors could access the full multi-manufacturer rebate information that Kabir sent to himself unless the reports containing that information were misappropriated from Express Scripts.  The confidential nature of this information allows Express Scripts to compete in the marketplace and having that information outside of the "four walls" of the company would destroy the company's competitive standing in the marketplace and provide whoever has access to that information an unfair competitive advantage.

44.     The materials that Kabir sent to his Yahoo! account also include data that Express Scripts charges pharmaceutical manufacturers a rebate administrative fee to access.

45.     Express Scripts derives substantial revenue from the access that it provides to manufacturers to those slices of data.  The value of that data access hinges upon the confidential and proprietary nature of the information at issue.  It is the confidentiality associated with the data that allows Express Scripts to maintain that aspect of its business.  If clients, competitors or others gain access to Express Scripts' Confidential Information that would effectively destroy that aspect of Express Scripts business and cause significant harm to Express Scripts.

46.     The materials that Kabir sent to his Yahoo! account also include trade secrets that Express Scripts uses to set pricing in the marketplace, bid business and win business.  Blind bidding is standard in the industry such that if any competitor were to have access to the pricing information and the data that forms the basis of Express Scripts's bids, that competitor would gain an unfair advantage.  Access to such information allow the competitor or anyone who is

privy to the data to learn Express Scripts's confidential rates at the drug level and would allow them to use that information in bids or negotiations against Express Scripts.

47. When a client invites Express Scripts and other PBMs to bid on their business, a critical aspect of the bid is the company's rebate guarantee. Express Scripts has invested millions of dollars and years of work negotiating the prices and confidential arrangements with pharmaceutical manufacturers that form the basis of its client rebate guarantees, which allow it to compete in the marketplace against CVS, Optum and mid-size PBMs.

48. Express Scripts strictly maintains the confidentiality of those arrangements and the information that forms the basis for its rebate guarantees and does not disclose that information to clients or the marketplace. The information is a trade secret that is central to Express Scripts's business.

49. If the information that goes into Express Scripts's rebate guarantees – which Kabir sent to his personal email address – was to be disclosed outside of Express Scripts, it would severely undermine Express Scripts's relationships with the pharmaceutical manufactures, potentially cause Express Scripts to breach its non-disclosure obligations to manufacturers, and destroy Express Scripts ability to fairly compete in the marketplace.

50. That rate guarantee information is among Express Scripts's most valued and indispensable assets. Express Scripts treats it as highly confidential trade secret information.

51. In addition to having Kabir (and other employees) sign confidentiality agreements, Express Scripts takes reasonable steps to safeguard the secrecy of such information and has instituted controls to keep this information confidential. For example, Express Scripts (a) requires employees who have access to the level of confidential information that Kabir did to agree to limit the use and disclosure of that information; (b) requires its customers, partners and

vendors to sign non-disclosure agreements; (c) password protects and maintains a dual-authentication system for its computer systems, password protects sensitive electronic files, regularly and conspicuously labels internal documents as confidential, and employs various physical security measures at its facilities; and (d) adopts and enforces several written policies that are designed to protect its confidential information and trade secrets, including restricting the ability of employees to upload documents and information to external devices and to access confidential information from non-company devices.

52.     Express Scripts's trade secrets and confidential information is not generally known outside of Express Scripts, and it would be near impossible for another company to duplicate this information.

53.     The information that Kabir sent to his Yahoo! email account is not just of value to competitors of Express Scripts.  It would also harm Express Scripts if it were to fall into the hands of clients of Express Scripts, who have no prior access to the company's pricing information, margins or the rebate data at issue, or consulting firms that are engaged by manufacturers to assist in negotiating against Express Scripts.  Even in audit settings, clients are unable to review the full extent of the data Kabir emailed to himself and, under no circumstances, can clients copy, take or retain such data.

54.     Kabir's emails confirm that, during the window when he was offloading confidential information, he was actively communicating with at least one consulting firm about a job opportunity.  Firms like the one that he discussed employment with would gain a considerable advantage in the marketplace and do considerable damage to Express Scripts business if they had access to the trade secret and confidential information that Kabir was sending to his Yahoo! account.

**C.     Kabir Misrepresented The Scope and Nature of the Materials He Took and Why He Took Those Materials When Confronted By the Company.**

55.     On December 16, 2020, upon learning of Kabir's unauthorized and egregious activity, Cigna's Ethics Group interviewed Kabir to get an explanation as to what had transpired. During that interview, Kabir proffered misleading and deceptive explanations concerning the type of data that he accessed and the supposed reasons for accessing the information.

56.     For example, Kabir represented that the data and material that he sent to his Yahoo! account was from prior to Express Scripts merger with Cigna, which happened in 2018. As the file names indicate and the files themselves prove, the data and information taken by Kabir was from 2020 and, in some instances, pertained to 2021.

57.     In actuality, there is no legitimate justification for Kabir's accessing and emailing Express Scripts's top secret and highly sensitive confidential information. Kabir's intentional deception in his dealings with the company investigators reviewing his actions underscores that Kabir's actions were willful and malicious.

**COUNT I**
**BREACH OF THE 2020 CONFIDENTIALITY AGREEMENT**

58.     Express Scripts restates and reasserts the previously numbered allegations as though fully set forth herein.

59.     Florida law governs this cause of action based on valid and enforceable choice-of-law provisions in the 2020 Agreement. *See* Ex. A, §2.1(b).

60.     Each of the confidentiality agreements signed by Kabir were  made for valid consideration: Kabir's employment (and continued employment) and the generous salary, bonuses, and increases in salary, equity grants, as well access to the confidential information in connection with his employment.

61.     The 2020 Agreement is a binding and enforceable contract that is necessary to protect the legitimate business interests of Express Scripts, and is reasonably limited in all respects.

62.     In signing the 2020 Agreement, Kabir acknowledged that its terms are reasonable and necessary to protect Express Scripts's legitimate business interests.  *See* Ex. A, §1.5(b).

63.     Pursuant to the 2020 Agreement, Kabir agreed that:

   a.     if he breached or threatened to breach or the Company reasonably believed that he was about to breach the terms of the 2020 Agreement, Express Scripts would "be entitled to injunctive relief as well as an equitable accounting of all earnings, profits and other benefits arising from violation of this Agreement, which rights shall be cumulative and in addition to any other rights or remedies to which the Company may be entitled in law or equity."  Ex. A, §1.6(a);

   b.     if he breached the 2020 Agreement, Express Scripts would "suffer immediate and irreparable harm and that money damages will not be adequate to compensate the Company or to preserve the status quo."  Kabir also consented "to the issuance of a temporary restraining order and other injunctive relief necessary to enforce" the 2020 Agreement.  Ex. A, §1.6(a);

   c.     in any legal proceeding to enforce the 2020 Agreement, the prevailing party shall be entitled to reimbursement of its actual costs and expenses, including without limitation reasonable attorneys' fees, costs, and disbursements."  Ex. A, §2.5.

64.     By its express terms, the confidentiality provisions of the 2020 Agreement survive the termination of Kabir's employment with Express Scripts.  Kabir therefore continues to be bound by those requirements of the 2020 Agreement.  Ex. A, §1.1.

65.     Express Scripts fulfilled its obligations under the 2020 Agreement by employing Kabir, providing him generous compensation during his employment, and providing him with access to confidential information.

66.     By the conduct described above, Kabir has materially breached the express provisions of the 2020 Agreement.

67.     As a direct and proximate result of Kabir's breach of the 2020 Agreement, Express Scripts has suffered and will continue to suffer, or inevitably will suffer, harm and

injury, including, but not limited to, loss of trade secrets, confidential information, competitive advantage, goodwill, income, revenue, customers, and market share.

68.     As a direct and proximate result of Kabir's breach or inevitable breach of the 2020 Agreement, Express Scripts has suffered and/or will suffer, immediate irreparable harm unless the Kabir is enjoined as requested below.

69.     Greater injury will be inflicted on Express Scripts by the denial of this relief than will be inflicted on Kabir by granting this relief.

**COUNT II**
**BREACH OF THE 2016 CONFIDENTIALITY AGREEMENT**

1.     Express Scripts restates and reasserts the previously numbered allegations as though fully set forth herein.

2.     Missouri law governs this cause of action based on valid and enforceable choice-of-law provisions in the 2016 Agreement. *See* Ex. B, §12.

3.     Each of the confidentiality agreements signed by Kabir were  made for valid consideration: Kabir's employment (and continued employment) and the generous salary, bonuses, and increases in salary, equity grants, as well access to the confidential information in connection with his employment.

4.     The 2016 Agreement is a binding and enforceable contract that is necessary to protect the legitimate business interests of Express Scripts, and is reasonably limited in all respects.

5.     In signing the 2016 Agreement, Kabir acknowledged that its terms are reasonable and necessary to protect Express Scripts's legitimate business interests. *See* Ex. B, §6.

6.     Pursuant to the 2016 Agreement, Kabir agreed that the breach of any provision of the 2016 Agreement "shall result in irreparable injury and damage to the Company, that there is

DocuSign Envelope ID: 826E61DC-7C23-47BF-A779-E72A1A00AAC0

no adequate remedy at law for such breach and that the Company should be entitled to specific performance, injunctive relief and other equitable remedies in addition to any remedies provide by law, together with the Company's attorney's fees and costs." *See* Ex. B, §10.

7.     By its express terms, the confidentiality provisions of the 2016 Agreement survive the termination of Kabir's employment with Express Scripts.  Kabir therefore continues to be bound by those requirements of the Agreement.  Ex. B, §11.

8.     Express Scripts fulfilled its obligations under the 2016 Agreement by employing Kabir, providing him generous compensation during his employment, and providing him with access to confidential information.

9.     By the conduct described above, Kabir has materially breached the express provisions of the 2016 Agreement.

10.     As a direct and proximate result of Kabir's breach of the 2016 Agreement, Express Scripts has suffered and will continue to suffer, or inevitably will suffer, harm and injury, including, but not limited to, loss of trade secrets, confidential information, competitive advantage, goodwill, income, revenue, customers, and market share.

11.     As a direct and proximate result of Kabir's breach or inevitable breach of the 2016 Agreement, Express Scripts has suffered and/or will suffer immediate irreparable harm unless the Kabir is enjoined as requested below.

12.     Greater injury will be inflicted on Express Scripts by the denial of this relief than will be inflicted on Kabir by granting this relief.

## COUNT III
## MISAPPROPRIATION OF TRADE SECRETS
## UNDER THE DEFEND TRADE SECRETS ACT
### 18 U.S.C. §§ 1836, *et seq.*

13.     Express Scripts restates and reasserts the previously numbered allegations as though fully set forth herein.

14.     In his position at Express Scripts, Kabir had access to and learned Express Scripts's trade secrets, including those defined under the Defend Trade Secrets Act ("DTSA"). *See* 18 U.S.C. § 1839(3).   Additionally, the documents Kabir accessed throughout his employment with Express Scripts, including in the days leading up to his departure, contain trade secrets as defined under the DTSA. *See* 18 U.S.C. § 1839(3).

15.     Express Scripts expended substantial resources in developing its trade secrets for its exclusive benefit.  Express Scripts's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by any third parties.

16.     Express Scripts does not disclose its trade secrets to its competitors, clients, industry consultants or the marketplace and has made reasonable efforts to protect them from unauthorized disclosure.

17.     Express Scripts communicated its trade secrets to Kabir in confidence during his employment and with the understanding that Kabir would only use them in the conduct of Express Scripts's business.  Kabir knew, as evidenced by the Agreement, that Express Scripts intended for all such information to remain confidential and to be used by him solely in the conduct of Express Scripts's business.

18.     Kabir has misappropriated Express Scripts's confidential and proprietary information that qualifies as trade secrets without the express or implied consent of Express Scripts.  *See* 18 U.S.C. § 1839(5).

19. As a direct and proximate result of Kabir's actual, threatened, and/or inevitable misappropriation of Express Scripts's trade secrets, Express Scripts has suffered and/or will suffer irreparable harm.

20. Express Scripts is entitled to injunctive relief to prevent Kabir's continued actual, threatened, and/or inevitable misappropriation of its trade secrets. Without injunctive relief, Express Scripts will be irreparably harmed by Kabir's actual, threatened, and/or inevitable misappropriation of its trade secrets.

21. As a direct and proximate result of Kabir's actual, threatened, and/or inevitable misappropriation of trade secrets, Express Scripts has suffered and/or will suffer substantial damages, the precise amount of which will be determined at trial.

22. Kabir's conduct has been willful, malicious, and outrageous and undertaken with reckless indifference to the rights or interests of Express Scripts.

23. Kabir's conduct has been willful, malicious, and outrageous and undertaken with reckless indifference to the rights or interests of Express Scripts, warranting an award of exemplary damages pursuant to the DTSA.

24. Express Scripts is entitled to the attorneys' fees that it incurs in this action pursuant to the DTSA.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS
## UNDER THE FLORIDA UNIFORM TRADE SECRETS ACT
### Fla. Stat. §688, *et seq.*

25. Express Scripts restates and reasserts the previously numbered allegations as though fully set forth herein.

26. In his position at Express Scripts, Kabir had access to and learned Express Scripts's trade secrets as defined under the Florida Uniform Trade Secrets Act ("FUTSA"), Fla.

DocuSign Envelope ID: 826E61DC-7C23-47BF-A779-E72A1A00AAC0

Stat. § 688.002. Additionally, the documents Kabir accessed throughout his employment with Express Scripts, including in the days leading up to the end of his employment on December 16, 2020, contain trade secrets as defined under the FUTSA.

27. Express Scripts has expended substantial resources in developing its trade secrets for its exclusive benefit. Express Scripts's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by any third parties.

28. Express Scripts does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized disclosure.

29. Express Scripts communicated its trade secrets to Kabir in confidence during his employment and with the understanding that Kabir would only use them in the conduct of Express Scripts's business. Kabir knew, as evidenced by the Agreement, that Express Scripts intended for all such information to remain confidential and to be used by him solely in the conduct of Express Scripts's business.

30. Kabir has misappropriated Express Scripts's confidential and proprietary information that qualifies as trade secrets without the express or implied consent of Express Scripts.

31. As a direct and proximate result of Kabir's actual and/or inevitable misappropriation of Express Scripts's trade secrets, Express Scripts has suffered and/or will suffer irreparable harm.

32. Express Scripts is entitled to injunctive relief to prevent Kabir's continued misappropriation of its trade secrets. *See* Fla. Stat. § 688.003 ("Actual or threatened misappropriation may be enjoined."). Without injunctive relief, Express Scripts will be irreparably harmed by Kabir's continued misappropriation of its trade secrets.

33.    As a direct and proximate result of Kabir's actual, threatened, and/or inevitable misappropriation of trade secrets, Express Scripts has suffered and/or will suffer substantial damages, the precise amount of which will be determined at trial.

34.    Kabir's conduct has been willful, malicious, and outrageous and undertaken with reckless indifference to the rights or interests of Express Scripts, warranting an award of exemplary damages pursuant to the FUTSA.

35.    Express Scripts is entitled to the attorneys' fees that it incurs in this action.  See Fla. Stat. § 688.005.

## COUNT V
## MISAPPROPRIATION OF TRADE SECRETS
## FLORIDA COMMON LAW

36.    Express Scripts restates and reasserts the previously numbered allegations as though fully set forth herein.

37.    In his position at Express Scripts, Kabir had access to and learned Express Scripts's trade secrets as defined under Florida common law.  Additionally, the documents Kabir accessed throughout his employment with Express Scripts, including in the days leading up to his departure, contain trade secrets as defined under Florida common law.

38.    Express Scripts has expended substantial resources in developing its trade secrets for its exclusive benefit.  Express Scripts's trade secrets derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by any third parties.

39.    Express Scripts does not disclose its trade secrets to its competitors and has made reasonable efforts to protect them from unauthorized disclosure.

40.    Express Scripts communicated its trade secrets to Kabir in confidence during his employment and with the understanding that they would be used by Kabir in the conduct of

Express Scripts's business. Kabir knew, as evidenced by the Agreement, that Express Scripts intended for all such information to remain confidential and to be used by him solely in the conduct of Express Scripts's business.

41. Upon information and belief, Kabir has misappropriated Express Scripts's confidential and proprietary information that qualifies as trade secrets without the express or implied consent of Express Scripts.

42. As a direct and proximate result of Kabir's actual, threatened, and/or inevitable misappropriation of Express Scripts's trade secrets, Express Scripts has suffered and/or will suffer irreparable harm.

43. Express Scripts is entitled to injunctive relief to prevent Kabir's continued actual, threatened, and/or inevitable misappropriation of its trade secrets. Without injunctive relief, Express Scripts will be irreparably harmed by Kabir's actual, threatened, and/or inevitable misappropriation of its trade secrets.

44. As a direct and proximate result of Kabir's actual, threatened, and/or inevitable misappropriation of trade secrets, Express Scripts has suffered and/or will suffer substantial damages, the precise amount of which will be determined at trial.

45. Kabir's conduct has been willful, malicious, and outrageous and undertaken with reckless indifference to the rights or interests of Express Scripts.

## COUNT VI
## BREACH OF FIDUCIARY DUTY

46. Express Scripts restates and reasserts the previously numbered allegations as though fully set forth herein.

47. Kabir owed a fiduciary duty of loyalty to Express Scripts at all times during his employment. This duty of loyalty required that Kabir act in the utmost good faith in furtherance

and advancement of the interests of Express Scripts, and to avoid acting contrary to Express Scripts's interests while employed by the company.

48.     As a former employee of Express Scripts who learned valuable trade secrets and confidential information during the course of his employment, Kabir continues to owe a duty of loyalty to Express Scripts.

49.     This duty of loyalty prohibits Kabir from using Express Scripts's trade secrets and confidential information except for Express Scripts's sole and exclusive benefit.

50.     Kabir's repeated accessing and unauthorized transmission of Express Scripts documents containing trade secrets and confidential information during the notice period preceding the formal end of his Express Scripts's employment for legitimate business purpose constitutes a pattern of behavior that is against Express Scripts's interests and, therefore, disloyal.  Such actions constitute a breach of the duty of loyalty.

51.     Upon information and belief, Kabir breached or inevitably will breach his duty of loyalty by using Express Scripts's trade secrets and confidential information for his benefit or the benefit of others outside of Express Scripts.

52.     Upon information and belief, Kabir breached or inevitably will breach his duty of loyalty by disclosing Express Scripts's trade secrets and confidential information to others outside of Express Scripts.

53.     Kabir breached his duty of loyalty by misappropriating Express Scripts's trade secrets and confidential information.

54.     Each of the above breaches were or will be deceitful, outrageous, and unjustified.

55.     Each of the above breaches illustrates Kabir's grossly negligent or intentional failure to act in good faith and solely for the benefit of Express Scripts in all matters.

56. As a direct and proximate result of Kabir's breach or inevitable breach of his duty of loyalty, Express Scripts has suffered, and/or will suffer, severe and serious economic injury and damage to its business operations and development, including irreparable harm and lost profits.

57. Plaintiffs are entitled to an award of punitive damages because Kabir's misconduct was willful, wanton, malicious, outrageous, and with intent to inflict serious injury on Plaintiffs.

**COUNT VII**
**BREACH OF CONTRACT**
**(RESTRICTED STOCK GRANT AGREEMENT)**

58. Express Scripts restates and reasserts the previously numbered allegations as though fully set forth herein.

59. On February 27, 2019, Kabir was granted shares of restricted stock pursuant to the Cigna Long-Term Incentive Plan and a Restricted Stock Grant Agreement. A true and correct copy of the Restricted Stock Grant Agreement is attached hereto as Exhibit D.

60. The Restricted Stock Grant Agreement provided:

Promise Not To Disclose Cigna Companies' Confidential Information:

(A) You Promise not to disclose any Confidential Information to any third party at any time, whether during or after your employment, without the prior written consent of Cigna (except to the extent required by an order of a court having competent jurisdiction or a properly issued subpoena) unless that Confidential Information was previously disclosed publicly by Cigna or has become public knowledge (other than by your disclosure).

Ex. D, §7(c)(5).

61. The Restricted Stock Grant Agreement defined Confidential Information as follows:

"Confidential Information" means any Cigna company trade secrets, confidential information, or proprietary materials, including but not limited to customer lists, financial records, marketing plans and sales plans.

Ex. D, §7(c)(5)(C).

62. Pursuant to the Restricted Stock Grant Agreement, if Kabir engages in willful misconduct or discloses Confidential Information, Kabir forfeits all unvested shares that were granted to him and must pay to Cigna the value he realized from shares that vested during the 12-month period ending on the date of the violation. *See* Ex. D, §8.

63. Pursuant to the Restricted Stock Grant Agreement, Cigna is entitled to seek and obtain an injunction without being required to post a bond. *See* Ex. D, §9.

64. Kabir's actions, including the transmission and retention of Plaintiffs' confidential, proprietary and trade secret information constitutes "willful misconduct" under the terms of the Restricted Stock Grant Agreement.

65. Kabir's actions, including the transmission and retention of Plaintiffs' confidential, proprietary and trade secret information constitutes a breach of the confidentiality provisions of the Restricted Stock Grant Agreement.

66. As a result of Kabir's willful misconduct and breaches of his confidentiality obligations, Kabir forfeited all unvested shares that were granted to him and must pay to Cigna the value he realized from shares that vested between October 16, 2019 and October 16, 2020.

67. Kabir realized $5,016 from shares that vested during the period between October 16, 2019 and October 16, 2020 and he is obligated to immediately pay that amount to Cigna.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully requests that this Court grant the following relief:

A. Enter judgment in favor of Plaintiffs on all counts of this Complaint;

B.     Enjoin Kabir, preliminarily until hearing, and thereafter permanently, from using, disclosing or retaining any of Plaintiffs' trade secrets or confidential information;

C.     Enjoin Kabir, preliminarily until hearing, and thereafter permanently, from working in any capacity that would lead to the inevitable use or disclosure of Plaintiffs' trade secrets or confidential information;

D.     Enjoin Kabir, preliminarily until hearing, and thereafter permanently, from breaching the obligations in the Agreements;

E.     Direct Kabir to immediately return to Plaintiffs all of its confidential and proprietary information, whether contained in documents, e-mails, electronic files, and elsewhere;

F.     Direct Kabir to immediately make available to a vendor engaged by Plaintiffs for a forensic examination, all of the computers and/or electronic devices in Kabir's possession or control, including Kabir's laptop(s); smart phones; tablets, hard drives, flash drives and any other electronic devices as well as Kabir's personal email accounts, so that the vendor can examine whether Kabir continues to possess Express Scripts's confidential and proprietary information and what, if anything, Kabir did with such information;

G.     Order expedited discovery related to Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Other Relief;

H.     Order Kabir to immediately pay to Cigna the $5,016 that he realized from shares of restricted stock that vested during the period between October 16, 2019 and October 16, 2020;

I.      Award Plaintiffs actual, compensatory, exemplary, and punitive damages, pre-judgment and post-judgment interest, reasonable attorneys' fees, and costs;

J.      Award Plaintiffs such other and further necessary and proper relief as the Court may deem just and proper.

## REQUEST FOR A JURY TRIAL

Plaintiffs request that this matter be heard by a jury for all matters so triable.

Dated: December 23, 2020                    Respectfully submitted,

/s/ *Mark E. Zelek*
Mark E. Zelek
Florida Bar. No. 66773
MORGAN, LEWIS & BOCKIUS LLP
mark.zelek@morganlewis.com
200 South Biscayne Boulevard, Suite 5300
Miami, Florida 33131
Telephone: +1.305.415.3303
Facsimile: +1.305.415.3001

Sean P. Lynch
MORGAN, LEWIS & BOCKIUS LLP
sean.lynch@morganlewis.com
502 Carnegie Center
Princeton, New Jersey 08540
Telephone: +1 609.919.6611
Facsimile: +1 609.919.6701

*Attorneys for Plaintiffs Express Scripts, Inc. and Cigna Corporation*

DocuSign Envelope ID: 826E61DC-7C23-47BF-A779-E72A1A00AAC0

## VERIFIED DECLARATION

I, Harold Carter, Vice President, Strategy & Contracting, at Express Scripts, declare under penalty of perjury that I have reviewed the facts in this Complaint and verify that they are true and accurate to the best of my knowledge, information, and belief.

Harold L. Carter