EXPRESS SCRIPTS, INC. and CIGNA
CORPORATION,

                Plaintiffs,

v.

AREFIN KABIR,

                Defendant.

Civil Action No. 6:20-cv-02365_____

## MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION WITH SUPPORTING MEMORANDUM OF LAW

1.      Plaintiffs Express Scripts, Inc. ("Express Scripts") and Cigna Corporation ("Cigna") (collectively, "Plaintiffs"), pursuant to Rule 65 of the Federal Rules of Civil Procedure, hereby move for this Court for entry of a Temporary Restraining Order requiring Defendant Arefin Kabir ("Kabir") to return the confidential, proprietary and trade secret information that he unlawfully took from Plaintiffs. Pursuant to Rule 4.05(b) of the Local Rules of this Court, Plaintiffs have alleged facts sufficient to show that injury is so imminent that notice and a hearing on the motion for temporary restraining order is impractical, if not impossible.

2.      Contemporaneously herewith, Plaintiffs filed a Verified Complaint with the Court, which is incorporated herein and made part of this Motion by reference.

3.      As stated in the Verified Complaint, Plaintiffs' rights with regard to their confidential and proprietary information, trade secrets and competitive interests are being and will continue to be violated by Kabir in direct contravention of the express terms of Kabir's Agreement with Plaintiffs, Plaintiffs' corporate policies and federal and state trade secret law.

4. Immediate injunctive relief is necessary to prevent further violations of Plaintiffs' rights by Kabir. Kabir has deliberately taken and retained Express Scripts's highly confidential and trade secret information by sending selected electronic files that he had no business reason to access from his company email address to his personal email address in the days and weeks preceding his departure from Express Scripts. The harm inflicted each day by Kabir's possession of those materials and the potential for dissemination of those materials is so imminent that a hearing is not practical. Thus, this Court should ender a Temporary Restraining Order immediately, and schedule a preliminary injunctive hearing thereafter.

5. Unless Kabir is enjoined from converting Plaintiffs' property, Plaintiffs will be irreparably harmed by:

A. Disclosure of trade secrets and other confidential information, which are solely the property of Plaintiffs;

B. Loss of confidentiality of the information contained in the highly sensitive materials that Kabir accessed and sent to his personal Yahoo! email address;

C. Loss of confidence and trust of customers and clients, loss of goodwill, and loss of business reputation;

D. Loss of substantial relationships with existing customers; and

E. Present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

6. Additionally, as part of Kabir's Confidentiality, Non-Disclosure and Non-Competition Agreement with Plaintiffs, Kabir consented to a temporary restraining order and preliminary injunction in the event that he breached or threatened to breach that Agreement.

7. Plaintiffs submit that immediate injunctive relief is the only means by which this Court can properly do equity, thwart Kabir's premeditated scheme to inflict irreparable harm, as well as his attempts to capitalize upon his misdeeds while knowing that he violated state and federal trade secret statutes, as well as common law duties. *See* 18 U.S.C. § 1831 et seq.; Fla. Stat. § 6888.001, et seq.; Fla. Stat. § 542.335.

8.     Plaintiffs are ready and willing to appear for a hearing at the Court's earliest convenience, but, in the interim, respectfully submits that a Temporary Restraining Order should issue immediately to prevent further harm pending a hearing.

WHEREFORE, Plaintiffs respectfully request that this Court ORDER that Defendant Arefin Kabir be enjoined from all conduct listed in the Proposed Order submitted herewith, and that this Court grant an Order consistent with the Proposed Order submitted herewith as well as any other relief, which this Court might deem appropriate.

## SUPPORTING MEMORANDUM OF LAW

## I.     PRELIMINARY STATEMENT

Defendant Arefin Kabir ("Kabir") worked as Director of Pharma Strategy & Contracting at Express Scripts.[1] In that role, Kabir was privy to the most sensitive trade secrets and confidential information used in Express Scripts's business, including highly-sensitive rate information, trade secret data concerning rebates negotiated by Express Scripts with drug manufactures, confidential customer data, etc.. Between October 16, 2020 and December 16, 2020, without authorization or any legitimate business need to do so, Kabir sent highly confidential formulary, pricing, rebate and other data and information to his personal Yahoo! email account.  Kabir remains in possession of that data and information, which are trade secrets and proprietary information of Express Scripts and from which Plaintiffs derive millions of dollars of revenue.

By taking these sensitive and proprietary materials from Express Scripts on his way out the door, Kabir breached his Confidentiality, Non-Competition, and Non-Solicitation Agreements, Express Scripts corporate policies and federal law.  Kabir has also placed Express Scripts at risk of losing millions of dollars in revenue.  Without this Court's intervention, Plaintiffs will suffer immediate and irreparable harm. Plaintiffs, therefore, request that the Court grant a temporary restraining order and, subsequently, a preliminary injunction preventing Kabir from continuing to breach his legal obligations to Plaintiffs.

---

[1]   Express Scripts is a subsidiary of Cigna that operates as a pharmacy benefit management ("PBM") organization that provides integrated pharmacy benefit management services, including network-pharmacy claims processing, pharmacy services, specialty pharmacy benefit management, benefit design consultation, drug-utilization review, formulary management, and medical an drug analysis services to manage drug plans for health plans, self-insured employers and government agencies (both as administrator of employee benefits and public assistance programs). Express Scripts also offers PBM services for workers' compensation insurance programs.

## II.   STATEMENT OF FACTS

### A.   Kabir's Confidentiality Agreements and Express Scripts's Policies Prohibit Sending Sensitive Confidential Information to Personal Emails and Taking Such Information for Non-Business Reasons.

As Director of Pharma Strategy & Contracting, Kabir occupied a position of trust and confidence, with access to some of the most sensitive and confidential aspects of Express Scripts's business. Kabir was involved in managing a portfolio of dozens of pharmaceutical contracts that generated sizeable revenue for Express Scripts. On behalf of Express Scripts, Kabir was involved in negotiating the terms and conditions of pharmaceutical contracts for Commercial, Exchange, Medicare and Medicaid books of business, and advising pharmaceutical manufacturers and consultants on market access and pricing. He provided advice to large national payers, rebate accumulators and PBM clients on therapeutic strategy development and net cost management.

Kabir and Express Scripts entered into multiple Confidentiality, Non-Competition, and Non-Solicitation Agreements prior to and during his Express Scripts employment. In October 2016, prior to the commencement of his Express Scripts employment, he signed a Confidentiality, Non-Competition, and Non-Solicitation Agreement (the "2016 Agreement"), as a condition of his employment. In March 2020, he signed another Confidentiality, Non-Competition, and Non-Solicitation Agreement (the "2020 Agreement") in conjunction with his receipt of an equity award from the company. Pursuant to the 2020 Agreement, Kabir agreed that he would not, during or after the termination of his employment, use or disclose any of Plaintiffs' trade secret information except as required by his responsibilities to Express Scripts:

(a) Employee agrees that all records and Confidential Information obtained by Employee as a result of Employee's employment with the Company, whether original, duplicated, computerized, memorized, handwritten, or in any other form, and all information contained therein or derived therefrom, are confidential and the sole and exclusive property of the Company. Employee understands and agrees that the business of the Company and the nature of Employee's employment will require Employee to have access to Confidential Information of and about the Company, its business, its prospects, and its Customers. During Employee's employment and

thereafter, Employee will not use Confidential Information or remove any such records or information from the premises or computer systems of the Company except for the sole purpose of conducting business on behalf of the Company. Employee further agrees that during Employee's employment and thereafter, Employee will not, without express consent of the Company, divulge or disclose this Confidential Information to any third party other than for the purposes of performing Employee's job duties with the Company, and under no circumstances will Employee reveal or permit this information to become known by any competitor of the Company.

(b) Employee agrees not to use or attempt to use any Confidential Information on behalf of any person or entity other than the Company, or in any manner which may injure or cause loss or may be calculated to injure or cause loss, whether directly or indirectly, to the Company. If at any time over the last two years of Employee's employment with the Company, Employee's position included access to Confidential Information as described above, specifically related to the Company's procurement of prescription drugs, Employee understands and agrees that Employee's subsequent employment with a pharmaceutical manufacturer, distributor or supplier ("Pharmaceutical Entity") would create a substantial risk of use and/or disclosure of Confidential Information with which Employee has been or will be entrusted during Employee's employment with the Company. Specifically, Employee agrees that the disclosure of such Confidential Information to the Company's pharmacy benefits management competitors with which one may negotiate in the course of employment with such Pharmaceutical Entity, would cause immediate and irreparable harm to the Company. In light of this risk of disclosure under such circumstances, and in recognition of the severity of harm that would result from such disclosure, Employee acknowledges and agrees that the Company will be entitled to immediate injunctive relief to prevent Employee from disclosing any such Confidential Information in the course of Employee's employment with any such Pharmaceutical Entity.

(c) During Employee's employment, Employee shall not make, use, or permit to be used, any materials of any nature relating to any matter within the scope of the business of the Company or concerning any of its dealings or affairs other than for the benefit of the Company. Employee shall not, after the termination of Employee's employment, use or permit to be used any such materials and shall return same in accordance with Section 1.2 below.

Ex. A, §1.1 ("Confidentiality, Non-Disclosure and Non-Use Obligations").

The 2020 Agreement defines "Confidential Information" as follows:

*"Confidential Information"* means all confidential and/or proprietary information and trade secrets that are not generally known to the public, in any form, whether oral, written, computerized or otherwise, regarding the Company, including but not limited to: computer code generated or developed by the Company; software or programs and related documentation; strategic compilations and analysis; strategic processes; business or financial methods, practices and plans; non-public costs and prices; operating margins; marketing, merchandising and selling techniques and information; customer lists and information; prospective customer lists and information; provider lists and information; vendor, supplier, and business partner lists and information; details of customer agreements; pricing arrangements with pharmaceutical manufacturers, distributors or suppliers including but not limited to any discounts and/or rebates; pricing arrangements with insurance clients and customers; pharmacy reimbursement rates; premium information; payment rates; contractual forms; expansion strategies; real estate strategies; operating strategies; sources

of supply; patient records; business plans; other financial, commercial, business or technical information related to the Company and confidential information of third parties which is given to the Company pursuant to an obligation or agreement to keep such information confidential.

Via the 2020 Agreement, Kabir also promised that he would, upon the termination of his employment, immediately deliver to Company all property of the company:

Employee agrees that upon termination of Employee's employment with the Company or at the request of the Company at any time, Employee will immediately deliver to the Company all property of the Company, including without limitation all equipment owned or leased by the Company, and all documents, information, records, materials, and copies thereof in any form, that are related in any way to the Company or its business, or which are otherwise referred to in Section 1.1 above and as defined in Section 1.9 below. Employee understands that this includes, but is not limited to, delivery to the Company of all documents, memoranda, notes, records, data, computer programs, disks, data contained on hard drives or other computer or electronic storage media, or reports (and all copies thereof) made or compiled by, delivered to, or otherwise acquired by Employee concerning, containing or embodying any Confidential Information.

Ex. A, §1.1 ("Return of Information, Records and Materials").

The 2016 Agreement and the 2020 Agreement confirm that Express Scripts conditioned Kabir's employment and compensation on his agreement to abide by their terms, including the confidentiality provisions. *See, e.g.*, Ex. A, Introductory Paragraph, Ex. B, Introductory Paragraph. Express Scripts would not have allowed Kabir to become or remain employed with the Company without his execution of the Confidentiality Agreements.

Kabir was also subject to Cigna's Information Protection Standards, including those with regard to acceptable use of Cigna's electronic systems and teleworking security requirements. Those standards prohibited Kabir from moving or copying from any Cigna network resource any highly sensitive and restricted information. Under those standards, employees may not electronically communicate any Cigna owned information outside of the organization unless approved by Cigna management in advance. Express Scripts also prohibits employees from communicating sensitive information (e.g., Cigna confidential, regulated data, non-public personal information) to the Internet, via email, text or instant messaging services.

The 2020 Agreement specifies that in any action alleging a breach thereof, the Company shall have the right to conduct a forensic examination of any computers and/or electronic devices in Employee's possession or control if the Company reasonably believes such devices contain confidential information or other Company property. It further states that in connection with any application for injunctive relief to enforce the 2020 Agreement, such forensic review and other necessary discovery shall be conducted on an expedited basis. *See* Ex. A, §1.6(d).

On February 27, 2019, Kabir was granted shares of restricted stock pursuant to the Cigna Long-Term Incentive Plan and a Restricted Stock Grant Agreement. A true and correct copy of the Restricted Stock Grant Agreement is attached to the Verified Complaint as Exhibit D. The Restricted Stock Grant Agreement provided:

Promise Not To Disclose Cigna Companies' Confidential Information:

(A) You Promise not to disclose any Confidential Information to any third party at any time, whether during or after your employment, without the prior written consent of Cigna (except to the extent required by an order of a court having competent jurisdiction or a properly issued subpoena) unless that Confidential Information was previously disclosed publicly by Cigna or has become public knowledge (other than by your disclosure).

Ex. D, §7(c)(5).

The Restricted Stock Grant Agreement defined Confidential Information as including "any Cigna company trade secrets, confidential information, or proprietary materials, including but not limited to customer lists, financial records, marketing plans and sales plans." Ex. D, §7(c)(5)(C). Pursuant to the Restricted Stock Grant Agreement, if Kabir engages in willful misconduct or discloses Confidential Information, Cigna is entitled to seek and obtain an injunction without being required to post a bond. *See* Ex. D, §9. Also, Kabir forfeits all unvested shares that were granted to him and must pay to Cigna the value he realized from shares that vested during the twelve-

month period ending on the date of the violation.[2]  *See* Ex. D, §8.

**B.     Kabir Offloaded Plaintiffs' Trade Secrets and Confidential Information Between October 16, 2020 and December 16, 2020.**

On October 16, 2020, Express Scripts notified Kabir that October 16 was his last day of work at Express Scripts and that he would remain on the books as a company employee until December 16, 2020.  Kabir was not expected to perform any work for Express Scripts during that sixty-day period but he could seek other jobs within the Cigna family of companies during that time.

The very day that Express Scripts notified Kabir that his employment was to be terminated, he began offloading Express Scripts's confidential information.  Between October 16, 2020 and December 16, 2020, Kabir had no legitimate business need to access, send or distribute Express Scripts's confidential or proprietary information.  Yet, during that window, Kabir accessed and sent to his personal Yahoo! email address, extremely valuable, incredibly sensitive and highly confidential Express Scripts data and information.  The activity in Kabir's Express Scripts email account confirms this calculated and unauthorized offloading of highly confidential information.  Among the documents and reports that Kabir sent from his Express Scripts email address (AKabir@express-scripts.com) to his personal Yahoo! email address (arefinkkabir@yahoo.com) were the following:

| Date Sent | Subject | File Names |
|---|---|---|
| 10/16/20 12:43pm | Email AK | ICCV 2021 Grid.pptx |
| 10/18/20 10:56pm | learning material | Commercial.xls<br>Medicare.xls |
| 12/14/20 11:04am | mail from ak | 2020_10_21 Pebble CPC Market Share |
| 12/14/20 11:14am | mail from ak2 | Master standard formulary status and pref alt 10 02 2020 |
| 12/16/20 12:36pm | mail from ak 3 | 3Q20 NPF & BoB CPD Mail-Retail |

---

[2]  Kabir realized $5,016 from shares that vested during the period between October 16, 2019 and October 16, 2020 and he is obligated to immediately pay that amount to Cigna.

Each time Kabir attempted to send one of the emails listed above, he received an alert email from the DLP eReview system at Express Scripts noting that the email was being held by the Express Scripts information technology systems. Each such alert email notified Kabir that company policy prohibits forwarding data to personal email addresses. In each instance, Kabir authorized the release of the emails at issue notwithstanding the alert and company policy. The alert and release authorization emails are attached to the Verified Complaint as Exhibit C.

The files that Kabir sent to his Yahoo! address contain critically sensitive, confidential information. For example, the files contain rebate data at a drug level for numerous pharmaceutical manufacturers. In the PBM context, manufacturers pay rebates to lower the net cost of products for clients and patients. The net cost of competing products is used to determine formulary placement. This rebate information is highly confidential and governed by written Non-Disclosure Agreements between the pharmaceutical manufacturers and Express Scripts/Cigna.

In his role at Express Scripts, Kabir's negotiated rebates with pharmaceutical manufacturers from a plan sponsor perspective. He is well aware that the rebate data that he accessed during his notice period and sent to his Yahoo! email address is highly sensitive information that is at the core of Express Scripts business. He also knows that Express Scripts uses that confidential rebate information to determine pricing and to drive down costs for clients, patients and the healthcare system by competing manufacturers of products against one another.

There is no way that clients or competitors of Express Scripts could access the full multi-manufacturer rebate information that Kabir sent to himself unless the reports containing that information were misappropriated from Express Scripts. The confidential nature of this information allows Express Scripts to compete in the marketplace and having that information outside of the "four walls" of the company would destroy the company's competitive standing in

the marketplace and provide whoever has access to that information an unfair competitive advantage.

The materials that Kabir sent to his Yahoo! account also include data that pharmaceutical manufacturers subscribe to receive from Express Scripts for a fee. Manufacturers pay to access subsets of data within the Express Scripts portal. Express Scripts derives substantial revenue from the access it provides to manufacturers to those slices of data based upon the confidential and proprietary nature of the information at issue. If clients, competitors or others gain access to Express Scripts' confidential information that would effectively destroy that aspect of Express Scripts business and cause significant harm to Express Scripts.

The materials that Kabir sent to his Yahoo! account also include trade secrets that Express Scripts uses to set pricing in the marketplace, bid business and win business. The industry involves blind bidding such that if any competitor were to have access to the pricing information and the data that forms the basis of Express Scripts's bids, that competitor would gain an unfair advantage. It would allow the competitor or anyone who is privy to the data to see Express Scripts's confidential rates at the drug level and would allow them to use that information in bids or negotiations against Express Scripts.

When a client invites Express Scripts and other PBMs to bid on its business, one of the critical aspects of the bid is each company's rebate guarantee. Express Scripts has invested millions of dollars and years of work negotiating the prices and confidential arrangements with pharmaceutical manufacturers that form the basis of its client rebate guarantees, which allow it to compete in the marketplace against CVS, Optum and mid-size PBMs. Express Scripts strictly maintains the confidentiality of those arrangements and the information that forms the basis for its rebate guarantees and does not disclose those to clients or the marketplace. That information is a

trade secret that is central to Express Scripts's business. If that information were to be disclosed outside of Express Scripts, it would undermine Express Scripts's relationships with the pharmaceutical manufacturers, put Express Scripts at risk of breaching its non-disclosure obligations to manufacturers and destroy Express Scripts ability to fairly compete in the marketplace.

In short, the information that Kabir sent to his personal email address is among Express Scripts's most valued and indispensable assets. Accordingly, Express Scripts treats it as highly confidential trade secret information. Indeed, it is precisely because Kabir had access to such information that Express Scripts included in the 2016 Agreement, the 2020 Agreement and the Restricted Stock Grant Agreement provisions to protect the secrecy of that information.

In addition to having Kabir sign the Confidentiality Agreements, Express Scripts takes considerable steps to safeguard the secrecy of such information and has instituted controls to keep this information confidential. For example, Express Scripts (a) requires employees who have access to the level of confidential information that Kabir did to agree to limit the use and disclosure of that information; (b) requires its customers, partners and vendors to sign non-disclosure agreements; (c) password protects and maintains a dual-authentication system for its computer systems, password protects sensitive electronic files, regularly and conspicuously labels internal documents as confidential, and employs various physical security measures at its facilities; and (d) adopts and enforces several written policies that are designed to protect its confidential information and trade secrets, including restricting the ability of employees to upload documents and information to external devices and to access confidential information from non-company devices.

The information that Kabir sent to his Yahoo! email account is not just of value to

competitors of Express Scripts.  It would also harm Express Scripts if it were to fall into the hands of clients of Express Scripts, who have no prior access to the company's pricing information, margins or the rebate data at issue, or consulting firms that are engaged by manufacturers to assist in negotiating against Express Scripts.  Even in audit settings, clients are unable to review the full extent of the data Kabir emailed to himself and, under no circumstances, can clients copy, take or retain such data.

Kabir's emails confirm that, during the window when he was offloading confidential information, he was actively communicating with at least one consulting firm about a job opportunity.  Firms like the one that he discussed employment with would gain a considerable advantage in the marketplace and do considerable damage to Express Scripts's business if they had access to the trade secret and confidential information that Kabir was sending to his Yahoo! account.

### C. Kabir Misrepresented the Scope and Nature of the Materials He Took and Why He Took Those Materials When Confronted by the Company.

On December 16, 2020, upon learning of Kabir's unauthorized and extremely concerning activity, Cigna's Ethics Group interviewed Kabir to get an explanation as to what had transpired. During that interview, Kabir proffered misleading and deceptive explanations concerning the type of data that he accessed and the supposed reasons for accessing the information.  For example, Kabir represented that the data and material that he sent to his Yahoo! account was from prior to Cigna's merger with Express Scripts, which happened in 2018.  As the file names indicate and the files themselves prove, the data and information taken by Kabir was from 2020 and, in some instances, pertained to 2021.

In actuality, the data and information Kabir took is current and there is no legitimate justification for his accessing and offloading that highly sensitive confidential information.

Moreover, Kabir's intentional deception in his dealings with the company investigators reviewing his actions underscores that Kabir's actions were willful and malicious.

## III.     LEGAL ARGUMENT

### A.     Plaintiffs Are Entitled to Injunctive Relief

Kabir's improper conduct warrants the issuance of injunctive relief against him. Plaintiffs can easily establish all of the elements necessary for preliminary injunction, and this relief is necessary to prevent continued irreparable harm to Plaintiffs' legitimate business interests. Plaintiffs have shown that (1) they have a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to Plaintiffs outweighs whatever damage may be caused to Kabir; and (4) if injunctive relief is issued, the injunction would outweigh any harm and serve the public interest. *See Siefel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000). While all of these elements must be established, none is controlling. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). This Court must balance each factor in light of the circumstances. *Id.* "In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction." *Johnson Controls, Inc. v. Rumore*, 2008 WL 203575, at *13 (M.D. Fla. Jan 23, 2008).

Here, injunctive relief is proper because Plaintiffs have demonstrated that under applicable law, after balancing the interests of the parties, the danger of injury to Plaintiffs significantly outweighs any theoretical harm that Kabir may experience by entry of relief. To be clear, Plaintiffs are not seeking to prevent Kabir from conducting any lawful activity or to deprive Kabir of any property that is lawfully his. Rather, Plaintiffs are seeking to protect the private, confidential, trade secret information that Kabir stole from Plaintiffs when he sent it electronically to his personal email address, which is a legitimate business interest.

1. **Plaintiffs Have a Substantial Likelihood of Success on the Merits**

   a. *Plaintiffs Will Prevail on Its Breach of Contract Claims*

Under Florida law, information that is not available to the public and is integral to a company's success constitutes "confidential business information." Fla. Stat. § 542.335; *AutoNation, Inc. v. O'Brien*, 347 F. Supp. 2d 1299, 1305 (S.D. Fla. 2004). Florida courts have repeatedly held that an injunction should issue where there is evidence than an employee took, without authorization, confidential business information, including pricing information and sensitive financial data. *See e.g. Nephron Pharm. Corp. v. Hulsey*, 2018 WL 11198250 (M.D. Fla. Sept. 26, 2018) (granting injunction where employee emailed confidential and proprietary pricing information, pricing sheets and data reports to her personal email address); *Medical, Inc. v. Sewpersaud*, 469 F. Supp.3d 1269 (2020) (granting temporary restraining order and preliminary injunction in action involving sensitive pricing and customer information); *Johnson Controls*, 2008 WL 203575, at *13 (granting injunction in action involving pricing information and data that formed the basis of the company's bids); *VAS Aero Servs. LLC v. Arroyo*, 860 F. Supp.2d 1349 (S.D.Fla. 2012) (granting temporary restraining order to protect confidentiality of company's agreement with its customer, pricing formulas and pricing terms); *Fish v. Adams*, 401 So. 2d 843, 845 (Fl. Ct. App. 1981) (explaining that, with regard to an employee's duty of loyalty to his employer, employee may not engage in disloyal acts in anticipation of his future competition, such as using confidential information acquired during his employment).

Here, Plaintiffs have a legitimate business interest in their confidential information, including the pricing data, rebate data, customer data and other sensitive business information, that Kabir has retained in his possession following his departure from Express Scripts. That confidential information is not generally known to, or readily ascertainable by proper means, by any of Express Scripts's competitors who could obtain tremendous economic value from its

disclosure or use.  By transmitting and retaining Plaintiffs' highly sensitive, confidential, trade secret information, Kabir unquestionably breached the valid and enforceable confidentiality/nondisclosure provisions in the 2016 Agreement, the 2020 Agreement and the Restricted Stock Grant Agreement.

### b.  *Plaintiffs Will Prevail on Their Trade Secret Misappropriation Claims*

Even in the absence of express written contracts, injunctive relief would be appropriate to protect Plaintiffs' confidential information from wrongful misappropriation by Kabir.  The Florida Trade Secrets Act ("FUTSA"), as well as the federal Defend Trades Secret Act ("DTSA"), prohibit misappropriation and misuse of confidential and trade secret customer information of the kind at issue in this case.  *See* Fla. Stat. §§ 688.001 et seq.; 18 U.S.C. § 1836 et seq.  The DTSA and FUTSA define "misappropriation" as the acquisition of a trade secret of another by a person without consent and by improper means.  *See* 18 U.S.C. § 1839(5); Fla. Stat. § 688.002(2).  Both also define "improper means" to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *See* 18 U.S.C. § 1839(6); Fla. Stat. § 688.002(1).

The DTSA and the FUTSA also authorize a court to grant an injunction to prevent 'actual' or 'threatened' misappropriation of a 'trade secret.'" *Heralds of Gospel Found., Inc. v. Varela*, No. 17-22281, 2017 U.S. Dist. LEXIS 98513, at *10 (S.D. Fla. June 23, 2017) (granting temporary restraining order in action brought under DTSA and FUTSA).  As such, if a plaintiff prevails on a claim under either, the plaintiff prevails under both, as the statutes are directly analogous to each other.

The FUTSA defines a trade secret as "information, including a formula, pattern, compilation, program, device, method, technique, or process that (a) derives independent

economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." *See* Fla. Stat. § 688.002 (4). Consistent with that, Florida courts routinely enter injunctive relief to prevent former employees from using the trade secrets of employers, specifically pricing and customer information, to the detriment of the employer. *See e.g. Hulsey*, 2018 WL 11198250 (granting injunction where employee emailed confidential and proprietary pricing information, pricing sheets and data reports to her personal email address).

In this instance, Kabir's misappropriation and conversion of Plaintiffs' confidential information, including pricing data, rebate data, customer and client data and confidential prospective business reports, constitutes an improper use and misappropriation of Plaintiffs' trade secrets, which must be enjoined to prevent irreparable harm to Plaintiffs. Therefore, Plaintiffs respectfully ask this Court to direct Kabir to return their trade secrets and make available his electronic devices and email accounts so that Plaintiffs can be assured that all copies of such materials have been returned and/or destroyed.

### 2.    Absent an Injunction, Plaintiffs Will Suffer Irreparable Harm.

To establish irreparable harm, the injury must be "actual and imminent rather than remote or speculative." *See Alt. Med. Integration Grp., L.P. v. Langford*, No. 8:13-cv-2909, 2014 U.S. Dist. LEXIS 115315, at *11 (M.D. Fla. Aug. 1, 2014). An injury is irreparable if it cannot be undone through monetary remedies. *See Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). Under Florida law, irreparable harm is presumed when there is a violation of an enforceable restrictive covenant. *See* Fla. Stat. §542.335(1)(j); *Merrill Lynch, Pierce, Genner v. Hagerty*, 808 F. Supp. 1555, 1558-60 (S.D. Fla. 1992). Moreover, the use of specific trade secrets is presumed to be an irreparable injury. *See* Fla. Stat. § 542.33; *Hagerty*, 808 F. Supp. at 1558.

Here, Kabir violated his Agreement and other common law obligations to Express Scripts by misappropriating Express Scripts's confidential information by retaining, transmitting and potentially disclosing and using that confidential information. Kabir's actions thus create a presumption of (and actual) irreparable harm.

Even in the absence of a presumption of irreparable harm, Plaintiffs have shown that they will suffer irreparable harm in the absence of such relief. First, absent immediate injunctive relief, it will be impossible to determine Plaintiffs' damages with any reasonable degree of certainty. Kabir has continued access to highly valuable confidential and trade secret information from which Plaintiffs derive millions of dollars and which, in some instances, is the subject of Non-Disclosure Agreements between Express Scripts and third parties. By retaining Plaintiffs' confidential information, Kabir has damaged and continues to damage Plaintiffs legitimate business interests, including its customer goodwill and competitive advantage. *See Johnson Controls*, 2008 WL 203575, at *13 ("[A] plaintiff may . . . establish irreparable injury where the total damages associated with plaintiff's losses, such as the loss of customer goodwill and fair competition, would be difficult to calculate."); *see also Leedom Mgmt. Grp. v. Perlmutter*, No. 8:11-cv-2108, 2012 U.S. Dist. LEXIS 35589, at *28-29 (M.D. Fla. Feb. 15, 2012) (irreparable injury can be established "where there is a loss of customer goodwill because the damages flowing from such losses are difficult to calculate"). The loss of Plaintiffs' competitive advantage through Kabir's unlawful taking of Plaintiffs' confidential information cannot be quantified in monetary terms. Accordingly, Kabir's actions require the issuance of an injunction to protect Plaintiffs from irreparable harm.

### 3. The Benefit of Granting Injunctive Relief Outweighs Any Harm to Kabir.

The benefit of injunctive relief to Plaintiffs far outweighs any potential harm to Kabir. On the one hand, an injunction would enforce Florida statute § 542.335, protecting Plaintiffs' investments, goodwill, business reputation, trade secrets, methods of business operation, and

contract rights. On the other hand, Kabir will suffer no harm if the injunction is entered.

On this point, it bears noting that Plaintiffs do not seek to prevent Kabir from earning a living or to deprive him of any lawfully owned property. Plaintiffs seeks only to enjoin him from misappropriating and misusing confidential information that belongs to Plaintiffs in violation of his clear and unambiguous confidentiality agreements. *See United Subcontractors, Inc. v. Godwin*, No. 11-cv-81329, 2012 U.S. Dist. LEXIS 67061 at *38 (S.D. Fla. Feb. 3, 2012) (courts do not hesitate to find that injunction's potentially severe impact upon a former employee does not outweigh harm to former employer for purposes of granting a preliminary injunction as long as restrictions are not overreaching).

### (a) *Only an Injunction Can Ensure That Confidentiality Is Preserved and Confidence Is Restored*

Kabir specifically acknowledged the unique nature of the confidential and proprietary information with which he was entrusted in his confidentiality agreements. *See* Exs. A, B and D. If Kabir is not restrained, Plaintiffs and the third parties with whom they have Non-Disclosure Agreements could lose the confidentiality of their sensitive pricing, rebate and other financial information. Additionally, Plaintiffs will suffer significant damage to their reputation and relationships with such third parties, and substantial lost profits. Immediate injunctive relief will protect Plaintiffs from continued unwanted exploitation of their confidential information and discourage employees from repeating these actions and jeopardizing the trade secret and confidential information of Plaintiffs and other companies in the future. An injunction is necessary to preserve confidentiality and industry confidence.

### (b) *Injunctive Relief Serves the Public Interest*

An injunction would promote the public interest in the enforcement of reasonable contracts and in the protection of the investment made by businesses in the development of their companies

and communities. As this Court has recognized, the public interest is served by protecting trade secrets and enforcing confidentiality agreements. *See Freedom Medical, Inc. v. Sewpersaud*, 469 F. Supp.3d 1269, 1279 (2020); *citing All Leisure Holidays Ltd. v. Novello,* No. 12-62328-CIV, 2012 WL 5932364, at *6 (S.D. Fla. Nov. 27, 2012).

Further, under Florida law, "if an 'enforceable restrictive covenant exists,' and the plaintiff seeks to protect a 'legitimate business interest,' public policy favors a temporary restraining order." *Manitowoc Co. v. Brisch*, No. 8:15-cv-1174, 2015 U.S. Dist. LEXIS 64709, at *5 (M.D. Fla. May 18, 2015). For the reasons previously discussed, the restrictive covenants that Kabir agreed to be bound by are valid and enforceable. Moreover, Plaintiffs have a legitimate business interest in safeguarding the private, confidential information of their customers and protecting their trade secrets from exploitation by a competitor. *See* Fla. Stat. Ann. § 542.335(1)(b) (defining "legitimate business interest" to include, among other things, trade secrets, valuable confidential business or professional information that otherwise does not qualify as trade secrets, substantial relationships with specific prospective or existing customers and customer good will). Accordingly, the public interest supports the entry of a temporary restraining order.

The U.S. Supreme Court emphasized the important public interest in protecting trade secret business information. In *Kewanee Oil Corp. v. Bicron Corp.*, the Court stated: "The necessity of good faith and honest, fair dealing, is the very life and spirit of the commercial world…. In addition to the increased costs for protection from burglary, wiretapping, bribery, and the other means used to misappropriate trade secrets, there is the inevitable cost to the basic decency of society when one firm steals from another. A most fundamental human right, that of privacy, is threatened when industrial espionage is condoned or is made profitable; the state interest in denying profit to such illegal ventures is unchallengeable." 416 U.S. 470, 481-487 (1974).

Plaintiffs seek only to enjoin Kabir from misappropriating and misusing their confidential and trade secret information and records, conditions to which Kabir already specifically agreed to as a matter of contract. Given that there are no public policy requirements that substantially outweigh the need to protect Plaintiffs' legitimate business interests, a temporary restraining order is appropriate. *See* Fla. Stat. Ann. § 542.335(1)(k).

## IV. THE RELIEF REQUESTED

For the foregoing reasons, Plaintiffs respectfully request the Court enter the injunctive relief sought in the proposed form of Order. Plaintiffs further pray the Court will award them compensatory damage, punitive damages, statutory damages, costs of suit, and attorney's fees in an amount to be proved at trial, and any other remedies that the Court deems appropriate.

Dated: December 23, 2020

Respectfully submitted,

/s/ Mark E. Zelek

Mark E. Zelek
MORGAN, LEWIS & BOCKIUS LLP
mark.zelek@morganlewis.com
200 South Biscayne Boulevard, Suite 5300
Miami, Florida 33131
Telephone: +1.305.415.3303
Facsimile: +1.305.415.3001

Sean P. Lynch
MORGAN, LEWIS & BOCKIUS LLP
sean.lynch@morganlewis.com
502 Carnegie Center
Princeton, New Jersey 08540
Telephone: +1 609.919.6611
Facsimile: +1 609.919.6701

*Attorneys for Plaintiffs*
*Express Scripts, Inc. and Cigna Corporation*